**TPS TECHNOLOGIES, INC., Plaintiff,**

v.

**RODIN ENTERPRISES, INC., Triangle Center Associates, RK Triangle Realty Four, Inc., and Buttzville Corp., Defendants.**

**No. 91–7040.**

United States District Court, E.D. Pennsylvania.

March 11, 1993.

---

Allan C. Preziosi, Lightman & Associates, Philadelphia, PA, for plaintiff.

Ivan J. Krouk, Philadelphia, PA, Suzette D. Bonfiglio, Jubanyik, Varbalow, Tedesco, Shaw & Shaffer, Cherry Hill, NJ, Robert Masters, Amvest Properties, Inc., Port Washington, NY, for defendants.

## ADJUDICATION AND MEMORANDUM

BRODY, District Judge.

Before me is the record submitted by the parties to the Court. I am being called upon to decide:

(1) Whether, in a contract requiring the contractor to treat all of the soil on the property determined to be contaminated by a third party, a permit exemption letter from the Pennsylvania Department of Environmental Resources ("Pa. DER") referring to "the approximately 1,000 tons of petroleum contaminated soil to be treated" that was incorporated into a contract as a performance warranty created a quantity term limitation of 1,000 tons? I find that it did not.

(2) Whether the general partners of a limited partnership, including both the withdrawing and substituted general partners pursuant to a certificate of amendment that was not filed with the state until after the liability was incurred, are liable to the contractor for amounts due and owing by the limited partnership? I find that they are.

This is a final adjudication of the merits of this diversity case based upon the trial briefs, written narratives of the direct testimony of the witnesses that the parties would have presented at trial, and trial exhibits submitted to the Court.[1]

## I. FINDINGS OF FACT.

This dispute arises from a contract between plaintiff TPS Technologies, Inc. ("TPS"), a Florida corporation, and defendant Triangle Center Associates ("Triangle"), a Pennsylvania limited partnership.[2] TPS seeks $58,637.80 plus pre-judgment interest at the rate of 1.5% per month plus attorney's fees from the three general partners of Triangle in compensatory damages for breach of contract or, in the alternative, under a claim of quantum meruit for services rendered. (*See* Plaintiff's Pretrial Memorandum).

The original general partners of Triangle identified on the certificate of limited partnership filed on August 28, 1986 were Rodin Enterprises, Inc. ("Rodin"), a Pennsylvania corporation, and Buttzville Corporation ("Buttzville"), a Netherlands Antilles corporation with its principal place of business in the United States in New York. (Exh. P–21).

During the fall of 1989, Triangle owned a property known as the Golden Triangle Shopping Center in Lancaster County, Pennsylvania; the property manager of the shopping center was a management company operated by Rodin, one of Triangle's general partners. (*See* Exh. P–23 at 13–14, 16).

Triangle first learned of a soil contamination problem from one of its tenants, a Jiffy Lube International franchisee that had agreed to construct a Jiffy Lube station on the site of an existing Gulf Oil Station at the center contingent upon Triangle's (1) demolishing the gasoline station and (2) turning over a "clean piece of property". (Exh. P–23 at 15). After being notified of the contamination problem, Stuart Seidman, a Rodin employee, contacted TPS in response to a magazine clipping from an industry publication about TPS's soil remediation process. (Exh. P–23 at 15–16, 21).

On December 8, 1989, Jeffrey Powell, the vice-president of TPS, forwarded brochures to Mr. Seidman describing the TPS remediation process that utilized on-site mobile soil remediation units for thermal treatment of petroleum contaminated soil. (Exh. P–2). One week later, Mr. Seidman requested a proposal from TPS. (Exh. P–3).

Mr. Seidman testified that Rodin—and most probably that he himself—initially told TPS that approximately 1,000 tons of soil were involved in the remediation after Rodin was advised of the same by Dunn Geoscience Corporation ("Dunn"), a company retained by Triangle to oversee the environmental remediation at the site. (Exh. P–23 at 69–70). In fact, the Dunn Summary and Recommendations to Rodin, dated March 8, 1990, identified "290 tons of contaminated soil" al-

---

**1.** At the pretrial conference of this non-jury trial, the parties conceded that there were few disputed facts, no credibility issues, and that disposition of the case was strictly a matter of contract interpretation based upon the written instruments. I then entered the following scheduling order:

"AND NOW, this 5th day of February, 1993, it is ORDERED that all parties shall submit to the Court by February 19, 1993, a detailed narrative statement for each witness identified in its pretrial memorandum. The narrative submitted for each witness shall be a statement of all the facts to which that witness would testify at trial. In accordance with my ruling at the pretrial conference of December 22, 1982, THERE WILL BE NO DIRECT EXAMINATION OF ANY WITNESSES AT TRIAL. Failure to submit a narrative identifying facts which that party would introduce through its witnesses at trial may result in a directed verdict being entered against that party.

It is further ORDERED that, on or before February 24, 1993, the parties will notify the Court as to whether it will require cross-examination of any witness for whom a narrative statement of testimony has been submitted."

After the parties notified me that they did not request or require cross-examination of the submitted narrative statements of direct testimony, I conducted a bench trial on the record submitted by the parties without receiving live testimony.

**2.** Jurisdiction of this case is pursuant to 28 U.S.C.A. § 1332 as there is a complete diversity of citizenship between the parties and the amount in controversy exceeds $50,000. This action was stayed as to defendant Triangle pursuant to its filing a petition in bankruptcy in January 1992.

ready excavated and stockpiled and referred to further excavation of "approximately 1,500 tons of soil." (Exh. P–14).

On March 25, 1990, in response to its letter request of March 13, 1990, TPS received a letter from Pa. DER exempting "the treatment of approximately one thousand (1,000) tons of petroleum contaminated soil" at the site from departmental plan approval and permit requirements. (Exh. P–22).[3]

On April 2, 1990, TPS forwarded a written proposal including its price quotation for remediation of soil at the property. (Exhs. P–1; P–4). The proposal consisted of a form agreement setting forth certain terms and conditions and a cover letter—identifying "The Rodin Group" as the client—stating, in pertinent part:

> TPS Technologies is pleased to present this quotation to thermally treat the petroleum contaminated soil located at the Golden Triangle property in Lancaster, Pennsylvania. TPS will utilize a Mobile Soil Remediation Unit to treat the soil. Laboratory decontamination analysis will be conducted by the Client or his agent during completion of the project to insure the processed soil TPH level is below 100 ppm.
>
> SRU Mobilization Cost . . . . . . . . . . . . . . waived
> Contaminated Soil Treatment
> Price . . . . . . . . . . . . . . . . . . . . . . . . . . . $65.00/ton

Term 8.1 of the form agreement was a warranty of performance by TPS:

> TPST warrants to the CLIENT that TPST will exercise reasonable care, skill, competence and judgement consistent with the standards for soil remediation set forth in TPST's operating permit for the State in which the work is being performed, a copy of which has been made available to the CLIENT and made part hereof (the "Permit"). Provided that the actual soil and site characteristics do not materially

vary from those set forth on the reverse side of the agreement.[4] If any soils processed by TPST fail to meet the standards set forth in the Permit, TPST shall reprocess such soil until such standards are met.

> In consideration of TPST's extension of this warranty to the CLIENT, the Client agrees that THIS WARRANTY SHALL BE EXCLUSIVE OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED.

TPS also transmitted to Rodin the March 25, 1990 exemption letter from Pa. DER with the April 3, 1990 proposal. (Exhs. P–4; P–22).

Mr. Powell agreed that TPS personnel would revisit the site on April 17, 1990. (Testimony of John Adderly at ¶ 7; Exh. D–3). The soil excavation was in progress during the TPS site visit. (Exh. P–15; Testimony of Mr. Powell at 2). The excavation was done by a local excavating contractor under the supervision of Dunn, which tested the soil as it was being excavated in order to determine the boundary lines of the depth and width of contaminated soil to be removed by the excavator. (Exh. P–23 at 70). Thus, as Mr. Seidman testified, Dunn determined the quantity of contaminated soil to be remediated. (Exh. P–23 at 26).

On April 19, 1990, Ivan Krouk, signing as President of Rodin (*see* Exhs. P–1 and P–5), signed the proposal on behalf of Triangle, which was substituted for Rodin as the "client" by a handwritten notation. (Exh. P–1). The proposal, according to its terms, became a "bona fide contract" when accepted by the client. (Exh. P–1). Mr. Seidman returned the executed contract to TPS the same day under a transmittal letter requesting that remediation begin at the site on April 27, 1990. (Exh. P–5).

---

**3.** Neither party submitted TPS's March 13, 1990 letter to Pa. DER requesting an exemption as an exhibit. The Pa. DER exemption was subject to the following conditions: (1) that the exemption was valid only for the specific project and location; (2) that the thermal treatment unit was not exempt from compliance with applicable air quality regulations; (3) that the "baghouse and

afterburner must be operated and perform (sic) as indicated in your request; and, (4) that Pa. DER would be notified of the starting date to allow it to inspect the facility. (Exh. P–22).

**4.** The exhibit submitted does not include a "reverse side."

The soil excavation was completed prior to the arrival of the TPS mobile incinerator. (*See* Exh. P–23 at 71). TPS's role was to take the excavated soil from the pile created by the excavating contractor, process it in the mobile incinerator, and conduct tests to insure that the remediated soil complied with federal and state guidelines. (*Id.* at 25–26). TPS began work on April 27, 1990 and completed treatment of the soil on May 12, 1990. (Testimony of Mr. Powell at 2; Exhs. P–6; P–7). Dunn verified the total tonnage remediated by TPS, that the soil treatment goals had been achieved, and that "this soil will now be suitable for use as backfill material during construction on this property." (Exhs. P–17; P–19; P–20).

TPS submitted two invoices for the work it performed at the site. The first invoice was dated May 11, 1990 in the amount of $58,637.80 for 902.12 tons remediated through May 5 (Exh. P–6); the second was dated May 16, 1990 in the amount of $59,552.35 for the remaining 916.19 tons remediated from May 6 through completion of the project (Exh. P–7).

Mr. Seidman testified that, although there was "despair" over the amount of contaminated soil, there was never any dispute regarding the amount of soil to be given to TPS for remediation. (Exh. P–23 at 41). Mr. Seidman approved payment of both invoices. (*See* Exhs. P–6; P–7). The second invoice was paid by check dated June 26, 1990. (Exh. P–8). Defendants refused to pay the first invoice, due on May 26, 1990, claiming that the 902.12 tons covered by that invoice exceeded the reference to "approximately 1,000 tons of soil" in the Pa. DER letter which they claim created a quantity term in the contract. (*See* Defendants' Pretrial Memorandum). Defendants claim that TPS failed to obtain written authorization to remediate any tonnage in excess of 1,000 tons under the contract term requiring written change orders in order to "modify the scope of work as defined by this Agreement." (*See* ¶ 5.1 of Exh. P–1).

On May 29, 1991, Triangle filed a certificate of amendment with the Pennsylvania Department of State; the certificate of amendment, which stated an effective date of April 9, 1987, substituted RK Triangle Realty Four, Inc., ("RK"), a Pennsylvania corporation, for Rodin as a general partner. (Exh. P–21).

## II.  CONCLUSIONS OF LAW.

*A.  The contract between TPS and Triangle required TPS to remediate all the contaminated soil at the property.*

The single disputed contractual issue in this case is whether the Pa. DER exemption letter incorporated by the contract created a quantity term limitation that TPS exceeded when it remediated 1,800 tons of contaminated soil. I find that it did not and that the executed proposal clearly and unambiguously required TPS to remediate all the contaminated soil "delivered" to it by the site remediation supervisor.

The construction of a contract is governed by the intention of the parties; where the nature of the transaction lends itself to judicial interpretation, the parties' intention may be determined as a matter of law, first, by looking to the express language used, and, second, from the apparent objects to be accomplished, from other provisions in the agreement, and from the surrounding circumstances at the time of the formation of the agreement. *Peacock Constr. Co. v. Modern Air Conditioning, Inc.,* 353 So.2d 840, 842 (Fla.1977); *Terex Trailer Corp. v. McIlwain,* 579 So.2d 237, 242 (Fla.Dist.Ct.App. 1 1991); *J & S Coin Operated Machines, Inc. v. Gottlieb,* 362 So.2d 38, 39 (Fla.Dist.Ct.App. 3 1978).[5] In construing a contract as a matter of law, I am bound to interpret the contract in a manner that is consistent with the reason, probability, and practical aspects of the underlying transaction. *Bay Management, Inc. v. Beau Monde, Inc.,* 366 So.2d 788, 791 (Fla.Dist.Ct.App. 2 1979.)

---

**5.**  Section 14.5 of the contract states, and the parties do not dispute, that Florida law governs the contract. There is no question that this case presents a contract "which lends itself to judicial interpretation," particularly since the parties never requested a jury and did not request any cross-examination of the opposing parties' testimony.

■ These rules of contract construction dictate a single possible interpretation of this contract: the proposal submitted by TPS and accepted and executed by Triangle required TPS to remediate *all* of the contaminated soil on the property. Any other interpretation would be unwarranted under the circumstances surrounding the formation and execution of the contract and would allow the defendants to avoid their payment obligations simply because the amount of contaminated soil may have been greater than originally anticipated.

Triangle was required to turn over a clean property to its tenant. Triangle's site remediation supervisor Dunn, not TPS, determined the amount of contaminated soil on the property. Triangle executed the TPS contract (1) after receiving the Dunn report and recommendations approximating 1,800 tons of contaminated soil at the site and (2) during excavation while Dunn was making a final determination of the total tonnage of contaminated soil on the property. Under Florida law, which provides that "a unit price contract provides for payment of the actual amount work done ... where the precise amounts needed are not known at the inception of the project," *Phillips & Jordan, Inc. v. Dept. of Transp.*, 602 So.2d 1310, 1313 (Fla.Dist.Ct.App. 1 1992), there is no question that TPS is entitled to be compensated for performing its contractual obligation to remediate *all* of the soil that Dunn determined was contaminated.

TPS does not dispute that the parties intended the Pa. DER letter to be "incorporated" into the contract through Section 8.1 of the Agreement, but correctly identifies section 8.1 as incorporating the "standards for soil remediation" required by Pa. DER as TPS's warranty of its performance of its duties under the contract.[6] I am unpersuaded by defendants' reliance on *Innkeeper's International, Inc. v. McCoy Motels Ltd.*, 324 So.2d 676 (Fla.App.4th 1975) cert. denied, 336 So.2d 106 (Fla.1976), which found that a contract could consist of a written

agreement and related correspondence, as authority to impose a quantity term limitation based on the reference to "approximately 1,000 tons" in the Pa. DER letter incorporated by the contract. The written agreement in *Innkeepers* included a purposefully omitted term left open for future agreement. In this case, the executed proposal required TPS to remediate all of the soil that a third party, Dunn, determined to be contaminated. It strains any possible interpretation of section 8.1 and would defeat the entire purpose of the contract to say that the incorporation of the Pa. DER letter created a quantity term limitation on the amount of soil that TPS was to remediate.

*B. All of the named defendants are liable to TPS for the outstanding invoice for soil remediation under its contract with Triangle.*

■ Under Pennsylvania law, all general partners of a Pennsylvania limited partnership are liable for the debts and obligations of the partnership. 15 Pa.C.S.A. §§ 8327, 8533(b) (Purd.Supp.1992).[7] Here, all three general partners of Triangle— Buttzville, Rodin, and RK Triangle—are to liable to TPS. Although the certificate of amendment substituting RK for Rodin as a general partner specifies that it is effective April 9, 1987, Triangle did not file the certificate of amendment with the Pennsylvania Department of State until May 29, 1991. Because a certificate of amendment becomes effective on the *later* of the effective amendment date specified on the certificate *or* the date the certificate was filed with the commonwealth, 15 Pa.C.S.A. § 8512(e) (Purd.Supp.1992), Rodin was a general partner at the time that Triangle incurred the liability and, indeed, Rodin was the partner that executed the proposal on behalf of Triangle. RK is also liable to TPS even though it did not become a partner until May 29, 1991, because an incoming general partner is liable for all the debts of the partnership incurred prior to its admission as a partner,

---

6. *See* plaintiff's pretrial memorandum at 8 ("TPS *does not dispute that the permit is incorporated into the contract.*").

7. The parties do not dispute that Pennsylvania law governs the issue of the liability of the general partners of a Pennsylvania limited partnership.

15 Pa.C.S.A. § 8329 (Purd.Supp.1992); however, RK's liability may be satisfied only out of the partnership property, (*id.*).

### C. *Conclusion.*

For the foregoing reasons, I will enter a verdict in favor of TPS and against defendants Rodin, RK, and Buttzville in the amount of $58,637.80. Pursuant to section 4.2 of the contract, TPS has a contractual right to pre-judgment interest and to costs of collection and reasonable attorneys' fees. Therefore, I will allow TPS ten (10) days from the date of the accompanying order to submit a motion and proposed order for pre-judgment interest, calculated to the date of the verdict, and for attorneys' fees along with supporting documentation and evidence of the reasonableness of the fee. Defendants shall have five (5) days after service of TPS's motion and proposed order to respond.