Nicholas MALKENTZOS, individually, and on behalf of "MM," an infant, Plaintiff,

v.

Barbara A. DeBUONO, as Commissioner of New York State Department of Health, New York State Department of Health, and New York City Department of Mental Health, Mental Retardation and Alcoholism Services, Defendant.

Nos. 95 Civ. 5569(CBM), 96 Civ. 172.

United States District Court, S.D. New York.

April 15, 1996.

**508**

Weil Gotshal & Manges by Victoria Kummer, New York City, for Plaintiff.

New York State Department of Law by Thomas Sofield, Kay Ann Porter, New York City, for State Defendants.

New York City Law Department by Elizabeth Wright, Albany, for Municipal Defendants.

## OPINION

MOTLEY, District Judge.

Plaintiff in *Malkentzos v. DeBuono,* 95 Civ. 5569, Nicholas Malkentzos, proceeds individually in this action and on behalf of his autistic three-year old son, "MM," against defendants Barbara A. DeBuono, the Commissioner of the New York State Department of Health, the New York State Department of Health, and the New York City

Department of Mental Health, Mental Retardation and Alcoholism Services, for violations of the Individuals with Disabilities Education Act, 20 U.S.C. sec. 1471, *et seq.,* ("IDEA").[1] Plaintiff now moves for a preliminary injunction compelling defendants to provide MM with 40 hours per week of applied behavioral analysis ("ABA") services or, alternatively, compelling defendants to reimburse plaintiff for providing these services and, in addition, reimbursing plaintiff for his out-of-pocket expenses incurred in providing these services to date. For the reasons set forth below, plaintiff's motion is granted in its entirety.

## I. FINDINGS OF FACT

### A. New York's Implementation Of IDEA

To implement IDEA in New York, the New York State Department of Health was designated as the so-called lead agency to provide education to disabled children from 0–3 years old. 20 U.S.C. sec. 1476; N.Y.Pub. Health Law sec. 2541.12 (McKinney's 1993). The New York State Department of Education is the lead agency for disabled children from 3–5 years old. N.Y.Educ.Law sec. 4403 (McKinney's 1995). The New York City Department of Mental Health, Mental Retardation and Alcoholism Services is charged with implementing the duties of the lead agencies within New York City.[2] H. 42–45.[3] Educational services provided under IDEA to disabled children ages 0–3 are called early intervention services and are provided pursuant to an Early Intervention Plan ("EIP").[4] These plans are determined

---

1. This case was consolidated with *Still v. DeBuono,* 96 Civ. 172, by court order dated January 30, 1996. There are currently pending in the *Still* case a motion to dismiss and a motion to remand; however, this opinion addresses only plaintiff's motion for a preliminary injunction in the *Malkentzos* case.

2. Much has been made by defendants of New York State's decision to allocate responsibility between two agencies based upon the age of the child. Yet it seems evident that this division was drawn to facilitate administration of IDEA; that is, New York State decided that the Department of Health would manage 0–3 year olds, while the Department of Education would manage 3–5 year olds. Review of the record and of IDEA yields no support for the argument that Congress intended to substantively differentiate among disabled infants, toddlers, and children. *Cf.* 20

U.S.C. sec. 1413(a)(14); 20 U.S.C. 1476(b)(13). Indeed, defendants' own expert, Dr. Crystal Kaiser, testified: "Infants such as MM are not to be regarded by their chronological age in determining how much they can handle of this or that [kind of instruction]. They are—children with developmental delays are regarded on the basis of their developmental levels." Tr. 229; *see supra* note 5.

3. "H." refers to the transcript of the evidentiary hearing held before this court on January 23, 1995.

4. EIP services are provided pursuant to IDEA, Part H, 20 U.S.C. sec. 1471, *et seq.,* Part 303 of Title 34 of the Code of Federal Regulations, Title II–A of Article 25 of the New York Public Health Law, and Subpart 69–4 of Title 10 of the Official

individually, according to each disabled child's need. H. 54–55. According to New York State Department of Health regulations, providers of early intervention services must be certified by New York State. There are about 7,000 to 8,000 children receiving early intervention services in New York City. H. 59. New York State has no guidelines describing what early intervention services are appropriate for disabled children; however, due to the confusion this had created, the Department of Health is currently considering adopting some. H. 55–56.

## B. Autism

Autism is a neurological disorder that prevents the afflicted individual from processing thought, and usually manifests in self-directed, self-stimulatory behaviors such as avoidance of human contact. Tr. 74–82.[5] It is also a relatively rare disability, affecting approximately "a handful per 100,000 [disabled] children." H. 59. Autistic individuals are unlike other developmentally disabled individuals in that they lack the skills to begin rudimentary forms of learning. H. 23–24, 94–95. However, with intensive one-on-one early intervention, autistic children are educable. Tr. 71. It is therefore essential that autistic children receive appropriate education as soon as possible, ideally, upon diagnosis as infants.[6] Tr. 73.

There are several educational modalities for autistic children, but ABA therapy is the only one that enjoys any quantifiable suc-

cess.[7] Tr. 73; H. 15–16, 83; Affidavit of Mary Ellen Herzog, dated November 19, 1995 ("Herzog Aff.") at 3. In recognition of the autistic child's inability to learn as others do, ABA breaks down activities into discrete individual tasks, and rewards accomplishment. Eventually, the child learns to integrate information and associate instruction with a given activity. Tr. 70–71, 75–80, 93, 96–97, 100–101. ABA is not administered indefinitely; usually after two or three years the child acquires learning skills and can proceed to more traditional education. H. 14–16. Studies have shown that 47% of autistic children who receive 40 hours per week of this therapy no longer need any special education at all by the time they are of school age. No other form of education enjoys an equivalent record with autistic children. H. 15–16, 83. In fact, ABA is the only program for autistic children with any demonstrated success rate at all. H. 16, 23–25; Herzog Aff. 3.

New York City currently has no early intervention program specifically designed to help autistic children. Rather, the only services available to them are those created for otherwise developmentally disabled children. H. 59–61. Clearly, such an arrangement is expedient for the City. However, serious questions exist about whether any benefit whatsoever is derived from placing autistic children in the sort of structured-play environment routinely used with disabled children.[8] H. 24. Such placement ignores the special difficulties of autistic infants and chil-

---

Compilation of Codes, Rules and Regulations of New York State.

5. "Tr." refers to the transcript of the impartial hearing on May 8 and May 11, 1995, which was received in evidence in this case as Plaintiff's Exhibit # 1.

6. In explaining why it is critical to offer autistic children ABA therapy at as young an age as possible, Ms. Joanne Gerenser (see infra sec. I(C)) testified:

> ... [T]here are two lines of thinking at this point. One is that from that time of age, there is reason to believe that we may be able to go in, and with intensive enough instruction, actually help them organize their learning abilities to the point where they may catch up to their normally developing peers, and down the road not require special education. There are nu-

merous articles that have been published in peer review journals that have shown the effects of 45 to 50% of children who have received this kind of instruction are currently in mainstream doing normal education settings. This has not been shown in any other treatment modality. There is that belief. And the other belief is that they are not learning when they are not engaged in instruction. Unfortunately, when they are given free time, that time often consists of their own self-directed activities, which unfortunately are not very productive in terms of learning.
> Tr. 73–74.

7. Applied behavioral analysis ("ABA") therapy is a form of treatment for autistic preschoolers developed by Dr. Ivar Lovaas at the Princeton Child Development Institute.

8. See supra note 6.

dren and can harm their development. H. 23–24; Tr. 58–59.

New York State, on the other hand, does offer some ABA programs to autistic children. The Stepping Stones School in Westchester County, run by the Union Child Daycare Center, provides in-home ABA services on a first-come, first-served basis to autistic children ages 0 to 5. This program is certified by the state, *i.e.* by defendants, and is fully funded by IDEA. H. 14. At least two other facilities in Westchester also provide ABA to autistic infants pursuant to a contract with the State: Baby's Prep and Home Program, Inc. H. 73–80. These programs (together, the "Westchester programs") provide up to 40 hours per week of in-home ABA services to autistic children, using both state-certified and uncertified trained personnel. H. 17. A child's acceptance into these programs depends on the availability of spots—not on the child's age. H. 27. New York State and New York City pay certified providers of both ABA and other early intervention services about $50 per hour. H. 22.

### C. Infant MM

In the fall of 1994, when MM was eighteen months old, he exhibited unusual behavior. Tr. 21–22. On the recommendation of his pediatrician, plaintiff requested EIP services from New York City's regional director in Staten Island, Judith Davison.[9] *Id.* Ms. Davison provided plaintiff with a list of approved EIP service providers. MM was then evaluated at Children At Play ("CAP"), a structured-play special education facility. Tr. 22–23. MM was found to be experiencing "generalized developmental delay" and was thus eligible for EIP services. Stip. 7–8.[10] MM's evaluators did not realize that he is autistic. Based upon their inaccurate evaluation of his disability, MM was offered an Individualized Family Service Plan ("IFSP") of 5½ hours a week of EIP services at CAP's facilities. Stip. 9–11. CAP's rate of success

with autistic children, if any, is unknown. Tr. 174.

In November of 1994, MM's pediatrician suggested that MM might be autistic and recommended that plaintiff consult Dr. Regina DeCarlo, a licensed pediatric neurologist, Tr. 23. Dr. DeCarlo diagnosed MM as autistic and prescribed a minimum of 20 hours per week of ABA. Stip. 13–15. Plaintiff, however, could not find an EIP provider of ABA services for MM. Tr. 27, 195. Plaintiff then appealed to the Eden II school for aid in setting up an ABA program in his own home.[11] Stip. 19; Tr. 28–29, 83. Eden II's Director of Social Services, Joanne Gerenser, suggested that plaintiff hire local college students majoring in psychology to work as in-home ABA tutors. Although Ms. Gerenser is qualified to provide these services under the State Board of Education guidelines, the students are not. Stip. 19–20. Thus Ms. Gerenser trained these students in ABA therapy and they worked for 20 hours a week at $10 per hour under her continuing supervision. Stip. 18; Tr. 28–29, 87. Had plaintiff hired state-qualified workers to provide MM with ABA therapy, they would have been considerably more expensive. Tr. 86.

MM's abilities improved as a result of the ABA therapy. Before beginning the program, MM avoided all human contact, had no apparent language comprehension and engaged in "operant vomiting" to avoid contact. Tr. 42–43, 76–79, 81–82. Nine months after the program began, however, MM was able to follow spoken instructions, make eye contact, speak, imitate activities, had a greater attention span, could indicate his needs and be held by his father. Tr. 44–45, 82–85, 98–100. In comparison, during his four weeks at CAP, MM's negative behavior, such as incessant crying and avoidance of human contact, had continued. Tr. 58–59. Due to MM's notable progress with ABA, Dr. DeCarlo recommended that his weekly hours be in-

---

9. Judith Davison, M.S.W., is the Early Intervention Designee with the New York City Early Intervention Program and Regional Director of the Early Intervention Program on Staten Island.

10. "Stip." refers to paragraphs in the parties' Stipulation Facts, submitted October 17, 1995.

11. Eden II is a private, New York State Board of Education certified center-based program that serves the developmentally disabled, including children ages 3–5, by providing ABA and other services under IDEA. Tr. 68–69, 80, 112–113.

creased to 40, Tr. 30, and plaintiff increased them to 30. Stip. 21–22.

Around this time, plaintiff returned to Ms. Davison to request, in light of the discovery of MM's autism, a revised IFSP that included 40 hours per week of ABA. Stip. 23. He was told that this was not possible due to a lack of ABA therapists. Tr. 195. At no time, however, was plaintiff told that ABA was illegitimate or that 40 hours per week was excessive. Tr. 33. Because MM progressed with ABA, and regressed with CAP, plaintiff withdrew MM from CAP on February 6, 1995, and continued with the at-home ABA services. Stip. 24; Tr. 53–54, 59. The next day, Ms. Davison and several therapists from Staten Island University Hospital amended MM's IFSP (the "amended IFSP") to provide 11 hours total of early intervention, including 8½ hours of ABA therapy (6 hours in-home and 2½ at Staten Island Hospital). Stip. 27–28; Tr. 17, 37–38. Of these 8½ hours, however, only 3–4 are spent actually providing ABA therapy to MM. Tr. 39.

On February 15, 1995, MM was evaluated by Dr. Ira Cohen, a licensed psychologist specializing in autism and associate with the Institute for Basic Research, who concurred in Dr. DeCarlo's diagnosis of autism and recommended a "minimum of 40 hours/week." Stip. 31; Tr. 41–42. Ms. Gerenser likewise recommended "35 to 40 hours a week of intensive behavioral therapy due to the extensive progress that [MM] has shown in the first three months of the [ABA] intervention." Tr. 91.

A new IFSP (the "new IFSP") has now been proposed for MM by evaluators at the Elizabeth Pouch Center in Staten Island University Hospital ("Pouch"). This new IFSP is scheduled to take effect upon termination of the amended IFSP on May 10, 1996, and it will consist of 23 hours of structured-play type services at Pouch. Tr. 164–66. MM will be placed in a group setting with non-autistic, developmentally disabled children and will not receive any ABA therapy.[12] Tr. 164. Evaluators at Pouch recommended this new IFSP without ever meeting

or evaluating MM. Tr. 169. Pouch's success rate with autistic children, if any, is unknown. *Id.*

In the meantime, MM receives 8½ hours of ABA therapy via his amended IFSP and plaintiff independently provides and funds the balance of the 40 recommended hours. Tr. 40. By November 8, 1995, plaintiff had spent approximately $13,400 for this purpose, and has incurred expenses of $300 to $400 per week ever since. *Id.* His total expenses to date are thus somewhere in the neighborhood of $21,000.

### D. The Impartial Hearing

On February 15, 1995, plaintiff requested an impartial hearing to challenge the appropriateness of the early intervention services being provided for under his amended IFSP, pursuant to N.Y.Pub.Health Law sec. 2549(3). This hearing occurred on May 8 and May 11, 1995, and witnesses for both sides testified. On June 9, 1995, the impartial hearing officer issued a brief decision in favor of defendants, finding that there was a shortage of "qualified personnel available to provide the additional [ABA] services." *See* Decision and Order of Jeffrey Kimmer in *In The Matter Of Nicholas Malkentzos Acting On Behalf Of "MM," Infant,* dated June 9, 1995, annexed to Plaintiff's Complaint as Exhibit #2. It was further held that the trained students used by plaintiff to provide the ABA "are not qualified personnel as defined by the [state] statute and regulations and therefore their services are not early intervention services under the Early Intervention Program and cannot be included in the IFSP nor can they be paid for by the program." *Id.* (citing N.Y.Pub.Health Law sec. 2555(1)). The hearing officer did not, however, address whether or not the EIP services offered to MM were "appropriate" under IDEA. This appeal followed.

This court now has before it the full record of the administrative proceeding below. To date, this case has been expedited due to the time-sensitive nature of plaintiff's claim, and on consent of all parties. On January

---

12. On the other hand, if MM lived in Westchester and there was a space open in one of the Westchester programs, he would be receiving ABA therapy right now through a program certified and approved by New York State. H. 20–21, 97–98.

23, 1996, this court heard additional evidence concerning the Westchester programs. Three witnesses testified: Mary Ellen Herzog, Director of Stepping Stones at Union Child Daycare Center in White Plains, Frank Zollo, Director of the Early Intervention Program for the New York State Department of Health, and Susanne Kaplan, Director of Services for Children with Disabilities with the Westchester County Department of Health. Plaintiff then requested judgment on the record before the court and, in the alternative, moved for preliminary injunctive relief. H. 102–03. Defendants opposed plaintiff's request for judgment on the record, and requested a trial to present additional evidence. H. 107. Accordingly, this court considers only plaintiff's motion for a preliminary injunction at this time.

## II. CONCLUSIONS OF LAW

### A. The Record

IDEA provides that after a final administrative decision from a hearing officer, an aggrieved party may seek judicial review in state or federal court. The court reviews the administrative record, hears additional evidence upon the request of either party, and grants any relief it deems appropriate. 20 U.S.C. sec. 1415(e)(2).

■ The record of an impartial hearing held pursuant to IDEA is to be given "due weight," and district courts must be "careful to avoid imposing [their] view of preferable educational methods." *Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). This court is to make an independent ruling on the merits of the plaintiff's claim based on a preponderance of the evidence, with "the source of the evidence generally ... the administrative record." *Town of Burlington v. Dep't of Education for the Commonwealth of Mass.*, 736 F.2d 773, 790 (1st Cir.1984), *affirmed*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Accordingly, on the instant motion for a preliminary injunction, this court considers both the administrative record and additional evidence presented on January 23, 1996 concerning the Westchester programs.

### B. Standard For Preliminary Injunction

■ Plaintiff is seeking preliminary injunctive relief. Usually, a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either "a likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of the hardships tipping decidedly" in favor of the movant. *Jolly v. Coughlin, et al.*, 76 F.3d 468, 473 (2d Cir. 1996); *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir.1994); *Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314–15 (2d Cir.1982).

■ A heightened standard applies when the injunction sought will alter, rather than maintain, the status quo—that is, a "mandatory" rather than "prohibitory" injunction. *Jolly*, 76 F.3d at 473 (citing *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995)). In such cases, the movant must make a "clear" or "substantial" showing of a likelihood of success, *id.*, and a strong showing of irreparable harm. *Doe v. New York University*, 666 F.2d 761, 773 (2d Cir.1981).

■ Because plaintiff in the instant case seek to compel defendants to provide MM with 40 hours per week of ABA services, as well as incidental monetary reimbursement, he seeks mandatory rather than prohibitory relief. A mandatory injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty*, 60 F.3d at 34. We find that plaintiff has met this heightened standard.

### C. Irreparable Harm

■ A showing of probable irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) (citations omitted). Plaintiffs must demonstrate that such injury is "imminent, not remote or

speculative," *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989), and that the alleged injury cannot be fully remedied by monetary damages. *See id.; Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917–18 (2d Cir.1986). The law in this Circuit requires a strong showing of irreparable injury where mandatory injunctive relief is sought, *Doe,* 666 F.2d at 773; *Pazer v. N.Y. State Board of Law Examiners,* 849 F.Supp. 284, 287 (S.D.N.Y.1994), and a sufficient showing in any case. *Reuters,* 903 F.2d at 907.

 This court finds that plaintiff has made this strong showing. In the absence of injunctive relief, his son will be deprived of his rights under IDEA. Compelling evidence has been presented to support the contention that, specifically in cases of autistic children, adequate education must be provided as early in life as possible. Defendants have not disputed this. Thus defendants' ongoing denial of MM's right to free appropriate education seriously jeopardizes MM's future development. *See infra* sec. II(D). And although plaintiff has so far paid for MM's ABA therapy himself, he and his wife are school teachers and at risk of running out of money. Thus this court concludes that the injury plaintiff faces in the absence of an award of injunctive relief is imminent damage to his son's personal and mental development. It is difficult to imagine more grave harm.

*D. Substantial Likelihood of Success on the Merits*

IDEA requires states, as a condition of accepting federal funding, to provide "a free and appropriate public education" to all children with disabilities. Congress' express purpose in enacting IDEA was to:

> assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with dis-

abilities and their parents or guardians are protected ... and to assess and assure the effectiveness of efforts to educate children with disabilities.

20 U.S.C. sec. 1400(c).[13]

IDEA defines a "free appropriate public education" to mean:

> [S]pecial education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with [an] individualized education program.

20 U.S.C. sec. 1401(18). In 1986, IDEA was amended to require states to provide appropriate education for disabled children ages 0–5. 20 U.S.C. sec. 1471–1485. This education must "meet the unique needs of the infant or toddler and the family, including the frequency, intensity and the method of delivering services." 20 U.S.C. sec. 1477(d)(4).

 In determining whether IDEA has been violated, "a court's inquiry ... is twofold. First has the State complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982). According to the Court, benefits provided under IDEA must be "meaningful." *Id.* at 192, 102 S.Ct. at 3043.

In *School Comm. Of Burlington v. Dep't of Education of Mass.,* 471 U.S. 359, 374, 105 S.Ct. 1996, 2005, 85 L.Ed.2d 385 (1985), the Supreme Court concluded that IDEA empowered courts to order reimbursement for expenses incurred in providing a child with appropriate "private special education," where the State's proposed individualized ed-

**13.** Although early intervention services are provided pursuant to Part H of IDEA, 20 U.S.C. sec. 1471 *et seq.,* such services are expressly deemed the equivalent of the "free appropriate public education" available to older children under 20 U.S.C. sec. 1400 *et seq. See* 20 U.S.C. sec. 1483(2).

ucational program was found to be improper under IDEA. The Court found that reimbursement in such situations comported with IDEA's spirit and history: "[t]he Act was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives." *Id.* at 373, 105 S.Ct. at 2004.

Here plaintiff charges that defendants have failed to meet their statutory obligation to provide MM with early intervention services appropriate for him. In support of this allegation, plaintiff cites the record below and the recommendations of MM's psychologist and pediatric neurologist. Specifically, it is contended that early intervention services defendants' offered to MM (described in the IFSP, amended IFSP and new IFSP) were not "reasonably calculated to enable the child to receive educational benefits," in compliance with IDEA's mandate. *Id.; Rowley,* 458 U.S. at 206, 102 S.Ct. at 3050–51; *Polk v. Susquehanna Intermediate Unit 16,* 853 F.2d 171, 177 (3d Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989).

■ This court agrees with plaintiff that the record is bereft of evidence that the IFSPs were created for MM to address his particular disability—autism. The first IFSP was devised before MM was properly diagnosed as autistic, and thus it can hardly be contended that it was appropriate to the needs of an autistic child. This IFSP was later amended because MM was diagnosed as autistic by an outside pediatrician, and because two of MM's doctors recommended 40 hours per week of ABA therapy. It included 8½ hours per week of ABA therapy, which MM's parents had to train personnel to perform. The new IFSP, scheduled to begin May 10, 1996, offers neither ABA services nor any services developed for autistic children. MM would be placed in a group for 23 hours per week with non-autistic disabled children in the same structured-play environ-

ment that has adversely affected his development in the past. It is also undisputed that no one from the facility that crafted the new IFSP, Pouch, has ever met MM. Indeed, MM has not been evaluated by any of defendants' EIP providers since he was diagnosed as autistic.

■ While plaintiff has offered substantial evidence regarding the special needs of autistic children and the relative appropriateness of various services for MM, defendants notably have not. Defendants argue that plaintiff is not entitled to the relief he seeks because (1) appropriate early intervention services were offered to MM, and (2) plaintiff is using unlicensed college students to provide ABA to MM. Defendants are correct that, as long as the services offered were "appropriate," plaintiff has not established a violation of IDEA. *Burlington,* 471 U.S. at 374, 105 S.Ct. at 2004. In providing disabled children with early intervention services, defendants are under no statutory obligation to provide every program, or the best program, or the program recommended by MM's doctors. States are not required to maximize the potential of a disabled child.

■ Nonetheless, defendants have not shown that the programs they offered to MM were appropriate for him. Their case is notably devoid of any substantive discussion of autism and why the IFSPs are appropriate for MM as an autistic child. Instead, their witness, Ms. Davison, testified at length that ABA providers are not available.[14] This begs rather than answers the question of whether MM is receiving services appropriate for his autistic disability; that is, the absence of availability of ABA services in state-certified programs does not establish defendants' wisdom in failing to provide them or prove the appropriateness of the prescribed IFSPs. The problem is that, in defendants' universe, what is "appropriate" to the child's needs is being *defined by* the program rather than *defining* the program.[15]

---

**14.** Ms. Davison explicitly conceded that defendants would have provided ABA services if such a program had been available: "Had Early Intervention approved providers that could provide [an ABA] program and if that were an available program under Early Intervention, then it could

have been approved." Tr. 187; *see also* Tr. 190–93.

**15.** For instance, Ms. Davison testified that the disabled child's needs are not evaluated pre-admission to a given program, only post-admis-

Dr. Crystal Kaiser, the early intervention specialist for the New York City Early Intervention Program, testified for defendants that ABA was "controversial" and that a prescription of 40 hours per week was "arbitrary." This is in obvious conflict with Ms. Gerenser's testimony and the recommendations of MM's doctors. For many reasons, this court credits plaintiff's witnesses and rejects Dr. Kaiser's opposing testimony. First, it should be emphasized that the question is what sort of plan is appropriate for MM—and not what is appropriate, generally, for disabled children. In considering this, it is elementary that those who have personally met and evaluated MM are far better positioned to discern what is appropriate for him. Dr. Kaiser has neither evaluated MM in person nor even met him.[16] Tr. 250. Her opinion concerning what plan is appropriate for this child is consequently of little value to the court.

In analogous contexts, the Second Circuit employs the so-called "treating physician rule." Under this rule, a treating physician's opinion "on the subject of a medical disability" is binding unless contradicted by substantial evidence in the record. *Schisler v. Heckler*, 787 F.2d 76, 81 (2d Cir.1986). Further, the treating physician's opinion is entitled to "some extra weight" in resolving any conflicts in the evidence. *Id.* This court likewise considers the recommendations of MM's doctors such as Dr. DeCarlo and Dr. Cohen (for 40 hours per week of ABA therapy) more persuasive than contrary testimony offered by those who do not know the child.

Similarly, this court finds Ms. Gerenser's testimony—that MM requires 40 hours per week of ABA therapy and that structured-play programs like CAP and Pouch are counterproductive for him—persuasive because she is the only autism and special education professional who has worked with MM. Tr. 22–23, 58–59, 86–87, 122. And although defendants' witnesses criticize the therapy that plaintiff provides to· MM, they offer no concrete counter-suggestions.

Defendants seem to fatally underestimate their obligation to meet MM's needs on a substantive and personal level. This means recognizing his difference as an autistic child and addressing it. Despite defendants' contentions, this court finds the distinction between autistic children and otherwise developmentally disabled children highly relevant in determining whether or not early intervention services offered under IDEA are appropriate.

Further, defendants' evidence concerning the "controversial" nature of ABA therapy is irreparably undercut by their licensure and approval of the Westchester programs which provide exactly this therapy to children exactly like MM.[17] Though the existence of these programs was clearly news to defendants, the court assumes that New York State would not have licensed and approved IDEA funding for ABA therapy unless it was considered appropriate under IDEA.

Defendants' other argument, that plaintiff cannot prevail because he used uncertified students to provide the ABA therapy to MM, is foreclosed by the Supreme Court's ruling in *Florence County School Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). In *Florence County*, the parents had withdrawn their

sion. Tr. 170. Since these programs do not send children elsewhere for appropriate services, the child is at the mercy, in a sense, of the program's offerings. MM's first evaluation was performed by a team at CAP and he was recommended services provided at CAP. Pouch, which did not even personally evaluate MM, likewise prescribed only services it could provide. Thus, if the child is autistic, and the program caters to non-autistic developmentally disabled, as here, the child will not be referred elsewhere to receive services "appropriate" for autism. Further, there is troubling evidence in the record that these programs have financial incentive to serve the children themselves, irrespective of both the child's needs and the program's capabil-

ities. This is because they only get paid, or funded through IDEA, if the child stays with them. *See, e.g.,* Tr. 40, 168–70.

16. Dr. Kaiser herself testified that it is important to look at the specific child and the specific child's needs in developing a plan for the child. Tr. 249.

17. It should be noted that while defendants argue that it is appropriate for autistic children to be placed in structured-play programs, they would never argue that it is appropriate to place non-autistic disabled children in ABA programs.

child from a public school providing inappropriate education and placed the child in a private school that was not on the state's list of approved schools as required by IDEA. Moreover, as in the instant case, some of the teachers were not state-certified as required by IDEA.

The Court held that reimbursement was not barred in this situation.[18] As long as the public placement violated IDEA, and the private program was appropriate under the Act, the private program need only be in "substantial compliance with all the substantive requirements" of IDEA. *Id.* at ——, 114 S.Ct. at 364. The Court observed that to hold otherwise would defeat the statutory purpose of IDEA and advised that "public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is IDEA's mandate, and school officials who conform need not worry about reimbursement claims." *Id.* at ——, 114 S.Ct. at 366. At least two other federal courts have applied *Florence County* to facts strikingly similar to those in this case and awarded parents reimbursement for the cost of providing appropriate early intervention services to their autistic children where the state had failed to do so. *See Delaware County Intermediate Unit # 25 v. Martin K.,* 831 F.Supp. 1206 (E.D.Pa.1993); *Union School Dist. v. Smith,* 15 F.3d 1519 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 428, 130 L.Ed.2d 341 (1994). In fact, in *Delaware County,* the parents were reimbursed for hiring uncertified trained students to give 40 hours of ABA therapy per week to their autistic child.

Here plaintiff has managed, against the odds, to provide his son with educational services appropriate for an autistic child. *Florence County* guarantees that, as long as it is ultimately determined that the services offered violated IDEA and his at-home services were appropriate, plaintiff cannot be denied reimbursement on the ground that he used trained, yet uncertified, personnel. Defendants themselves use uncertified personnel to provide ABA therapy in the Westchester programs.

▮▮▮▮▮ In considering the decision rendered in the administrative proceeding below on June 9, 1995, it is evident that the hearing officer failed to consider the Supreme Court's recent decision in *Florence County*. As a matter of law, the use of uncertified personnel alone does not defeat plaintiff's claims for reimbursement. Also, the hearing officer never reached the issue of whether or not defendants' EIP services comport with IDEA's mandate, *i.e.,* are they appropriate. This court finds that plaintiff has made a substantial showing that, in the case of MM, they do not. Defendants' alleged lack of ABA trained personnel does not relate to this question. Finally, the hearing officer also concluded that, "the [state] statute does not contain any provision requiring the municipality to train people to insure that the number of improved providers is sufficient to meet the needs of all eligible children nor do I believe that such a requirement can be inferred from N.Y.Pub.Health Law sec. 2552(1)." While this is true, IDEA mandates that defendants give MM a free and appropriate education. If defendants do not train the necessary personnel themselves, they can continue to reimburse plaintiff for providing his son with an appropriate education. *See Florence County,* 510 U.S. at ——, 114 S.Ct. at 366. Accordingly, this court disagrees with the ultimate conclusions of the hearing officer and finds that plaintiff has demon-

**18.** The Court cited its earlier decision in *Burlington* to explain its conclusion in *Florence County:* " '[P]arents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate private placement.' ... For parents willing and able to make the latter choice, 'it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials.' ... Because such a result would be contrary to IDEA's guarantee of a 'free appropriate education,' we held [in *Burlington* ] that 'Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.' " *Id.* at ————, 114 S.Ct. at 364–65 (citations omitted).

strated a substantial likelihood of success on the merits of his claim.

### E. Plaintiff's Entitlement to a Monetary Award on a Motion for a Preliminary Injunction

A monetary award "incidental to or intertwined with injunctive relief" may be equitable rather than legal. *Chauffeurs, Teamsters & Helpers, Local 391 v. Terry,* 494 U.S. 558, 571, 110 S.Ct. 1339, 1348, 108 L.Ed.2d 519 (1990) (citing *Tull v. United States,* 481 U.S. 412, 424, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987)).[19] This court is empowered to grant the relief it determines to be appropriate. 20 U.S.C. sec. 1480(1); *see also Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960) (district court had power, incident to its injunctive power, to award backpay under the Fair Labor Standards Act). Consequently, we hold that, given the unique facts of this case, it is appropriate to award plaintiff the nominal sum that he has so far expended in providing early intervention services to MM, as incidental to the injunctive relief we grant.

Further, the Supreme Court has noted that a parent's request for reimbursement under IDEA does not constitute a request for damages: "Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *Burlington,* 471 U.S. at 371, 105 S.Ct. at 2003. Here, the services that were provided by plaintiff at his own expense, for which he seeks reimbursement, precisely mirror the services offered by Stepping Stones, *i.e.,* they were neither more extravagant nor more expensive. In fact, it would have cost defendants five times more to provide early intervention services to MM. H. 22; Tr. 40. This court, therefore, finds plaintiff's request to be reasonable as well as financially expedient, in light of the strength of his case.

### III. CONCLUSION

Plaintiff has made a strong showing of irreparable harm and has demonstrated a substantial likelihood of success on the merits of his claim under IDEA. Because the monetary relief plaintiff seeks at this time is indeed incidental to the injunctive relief he seeks this court grants his motion for a preliminary injunction in full. Defendants will have the option of either providing 40 hours per week of ABA therapy to MM or of reimbursing plaintiff for arranging these services. In addition, defendants will reimburse plaintiff for his proven expenditures to date.

### ORDER

In accordance with the accompanying opinion, plaintiff's motion for a preliminary injunction in the above-captioned case, *Malkentzos v. DeBuono,* 95 Civ. 5569, is granted in its entirety. Defendants are accordingly directed to reimburse plaintiff for out-of-pocket expenses incurred to date in providing his son, MM, with 40 hours per week of ABA therapy and, in addition, defendants are directed to either provide MM with 40 hours per week of ABA therapy or reimburse plaintiff for continuing to provide same.

SO ORDERED.

---

**19.** Where a plaintiff seeks only money damages, this does not apply. *Id.* However, in the instant case, the primary relief plaintiff seeks is injunctive; *i.e.* a change in EIP services for MM.